Filed 11/26/14  P. v. Fernandez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JACOBO ARANDA FERNANDEZ,<br><br>    Defendant and Appellant. | G050247<br><br>(Super. Ct. No. INF1101903)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Ronald L. Johnson, Judge.  (Retired judge of the San Diego Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric Swenson and Barry Carlton, Deputy Attorneys General, for Plaintiff and Respondent.

*     *     *

A jury convicted defendant Jacobo Aranda Fernandez of robbery (Pen. Code, § 211),[1] burglary (§ 459), and possession of stolen property (§ 496). As to the robbery, the jury found defendant had personally used a firearm. (§§ 1192.7, subd. (c)(8), 12022.53, subd. (b)). The court sentenced him to a prison term of 13 years for the robbery (including 10 years for the gun use enhancement). The court imposed a concurrent term for the burglary, and stayed sentence for possession of stolen property.

On appeal, defendant contends (1) the prosecutor committed misconduct, (2) the jury committed misconduct, (3) the court erred by denying him an evidentiary hearing on jury misconduct, and (4) the errors individually or cumulatively prejudiced him. We affirm the judgment.

FACTS

Around 9:00 p.m. on April 23, 2011, Brandi Sedillo arrived home and parked her car in front of her house.[2] Her three-year-old son was in the car's backseat. At the time, Sedillo was 22 years old, 5 feet tall, and weighed 120 pounds.

A white car drove by on the other side of the street and made a U-turn. As Sedillo leaned into the backseat to take her son from his car seat, the white car pulled up very close to her rear bumper. Sedillo heard someone run up to her.

Sedillo turned to see a man pointing a gun at the right side of her head. In clear English without a foreign accent, he said, "Give me your bag." Fearing for her life and that of her son, Sedillo said, "No . . . please, I have my son." When Sedillo did not hand over her purse, the man "grabbed" it off her shoulder. Before he got back into his

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] All dates refer to 2011, unless otherwise stated.

2

car and sped away, she took another look at his face. The stolen purse contained her driver's license, an iPod, a camera, and two of her paychecks from her employer, Togo's Sandwiches.

By that time, her neighbors were outside. She ran to them, and they helped her call the police. When the officers arrived, Sedillo told them the robber was a man in his 20's or 30's, about 5 feet 8 inches tall and weighed 200 pounds, wearing blue jeans, a white T-shirt, and wraparound sunglasses. She further described him as a clean-shaven White male, with a stocky build and a square face. He had spiked brown hair.

Later that night, after the officers left, Sedillo remembered that her paychecks were in the stolen purse. She told her housemate, Denise Knight, about the missing checks. Knight was also Sedillo's boss at Togo's Sandwiches. Knight made several phone calls and stopped payment on the paychecks.

Three days later, on April 26, defendant showed up at Atoyaz Market, a local convenience store owned by Jose Esparza. Esparza offered his customers check-cashing services, an operation which he monitored with two surveillance cameras. He required repeat customers to place a fingerprint on the back of cashed checks. He did *not* require them to present identification. Defendant had regularly cashed checks at Atoyaz Market for years, but went by the name of "Mario Luna."

This time, defendant presented two checks, payable to Brandi Sedillo, and endorsed them in her name. Unlike his previous visits, he wore a hat with a very large, face-obscuring brim. On this occasion, at least, defendant used his pinky finger to make a fingerprint on the backs of the checks.

On April 28 or 29, Esparza learned Sedillo's paychecks had bounced. Esparza checked the surveillance recording of the transaction and saw it was defendant who had cashed the bad checks.

On May 20, about 20 days after he cashed the checks, defendant returned to Atoyaz Market. Esparza confronted him about the bad checks. At first, defendant denied

3

presenting the checks. Then, after Esparza showed him the surveillance video, he admitted cashing the checks and apologized. Instead of calling the police, Esparza allowed defendant's mother to pay for the bad checks. After this incident, defendant never returned to Atoyaz Market again.

On May 21, Sedillo went to Atoyaz Market after learning her stolen checks had been cashed there. Esparza showed Sedillo images from a video of defendant dated May 20, because the first video taken of defendant cashing the checks had already been erased. Sedillo recognized the images as those of the person who had robbed her. In the video, defendant wore the same sunglasses and T-shirt her assailant had worn on the night of the robbery.

On June 27, Detective Alirio Moulin was assigned the case of Sedillo's stolen paychecks. Upon seeing the suspect's photo in the police report, Moulin recognized the suspect as defendant, his former teammate from a Palms Springs recreational soccer league. That same day, Moulin visited Sedillo at her home. He showed her a six-pack photo lineup and asked her if she could identify the person who had robbed her. Sedillo first identified defendant as the man who cashed the checks. When asked to identify the person who robbed her, she observed that the robber had the same features as defendant, but had more hair. Finally, she identified defendant as the robber, except that he had shaved his head and grown facial hair.

DISCUSSION

I

PROSECUTORIAL MISCONDUCT

Defendant contends the prosecutor committed many acts of misconduct. As a threshold matter, he has not forfeited these claims on appeal. His trial counsel made timely objections below, and any further objection or request for admonition would have been futile. (*People v. Price* (1991) 1 Cal.4th 324, 447 [defendant forfeits prosecutorial

4

misconduct claim unless defense objected at trial and requested admonition, or unless admonition would not have cured harm caused by misconduct]; *People v. Arias* (1996) 13 Cal.4th 92, 159 [claim not forfeited if objection would be futile]; *People v. Green* (1980) 27 Cal.3d 1, 35, fn. 19, overruled in part on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 234 [claim not forfeited if defense had no opportunity to request admonition].)

Prosecutorial misconduct violates the federal Constitution if it "infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) "'Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.""'" (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*).)

"[O]nly misconduct that prejudices a defendant requires reversal [citation], and a timely admonition from the court generally cures any harm." (*People v. Pigage* (2003) 112 Cal.App.4th 1359, 1375.) Misconduct under federal constitutional law is reversible error unless the reviewing court finds beyond a reasonable doubt the misconduct did not affect the verdict. (*Ibid.*) Misconduct under state law mandates reversal if there is a reasonable probability a result more favorable to the defendant would have occurred absent the error. (*Ibid.*)

With these precepts in mind, we turn first to defendant's claims the prosecutor committed misconduct during her closing statement and rebuttal. We then address his contentions she committed misconduct while questioning witnesses.

A. *Closing Statement and Rebuttal*

Defendant contends the prosecutor, during her closing statement and rebuttal, committed misconduct by (1) shifting the burden of proof to him, (2)

5

inaccurately defining "reasonable doubt," (3) implicitly commenting on his failure to testify, and (4) implying he had escaped punishment for prior wrongdoing.

A prosecutor's improper comments during closing argument can constitute misconduct.  A prosecutor is subject to limitations on the scope of closing argument and the method of presenting it.  (5 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Trial, § 758, pp. 1177-1178.)  Nonetheless, "'a prosecutor is given wide latitude during argument'" and may make fair comment on the evidence and draw reasonable inferences from it.  (*People v. Wharton* (1991) 53 Cal.3d 522, 567.)  But "a prosecutor may not go beyond the evidence in his argument to the jury," for example, by suggesting "the existence of 'facts' outside the record."  (*People v. Benson* (1990) 52 Cal.3d 754, 794-795.)

During rebuttal, a prosecutor's arguments "that otherwise might be deemed improper do not constitute misconduct if they fall within the proper limits of rebuttal to the arguments of defense counsel."  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026.)  For example, a prosecutor may comment on whether defense counsel's closing argument is persuasive.  (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1155, disapproved on a different point by *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.)

In determining whether a prosecutor's comments to the jury constituted misconduct, "'"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."'"  (*People v. Ayala* (2000) 23 Cal.4th 225, 284.)  "In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements."  (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another point in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.)  In addition, the prosecutor's statements must be viewed "in the context of the argument as a whole."  (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

6

1. *The prosecutor did not shift the burden of proof.*

The court instructed the jury that the People must prove a defendant guilty beyond a reasonable doubt. (CALCRIM No. 220.) Nonetheless, defendant contends the prosecutor shifted the burden of proof to him by (1) in her rebuttal, arguing he produced no evidence he did not know the checks were stolen, and (2) in her closing statement, misstating the reasonable doubt standard of proof.

A prosecutor shifts or lessens the People's burden of proof if he or she misleads or confuses the jurors about which party bears the burden. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1075 (*Berryman*), overruled on another point in *Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1 [no lessening of burden of proof absent reasonable likelihood jury construed or applied prosecutor's "remarks in an objectionable fashion"].)

We turn first to defendant's contention the prosecutor shifted the burden of proof to him by stating there was no evidence he did not know the checks were stolen. The prosecutor made this comment in her rebuttal to defense counsel's closing statement. In defense counsel's closing statement, he emphasized there was no evidence defendant knew Sedillo's checks were stolen.[3] In rebuttal, the prosecutor responded: "But there was no evidence presented that he did not know they were stolen. All the evidence presented was that he knew they were stolen."

The prosecutor's remarks were a fair comment on the evidence and came within the proper limits of rebuttal argument, responding, as they did, to doubts defense counsel had tried to cast on the evidence (or lack thereof). (*People v. Medina* (1995) 11 Cal.4th 694, 758-759; *People v. Jones* (1997) 15 Cal.4th 119, 186, overruled on another ground in *Hill, supra*, 17 Cal.4th at p. 823, fn. 1 [prosecutor may make "fair comments" on defense evidence].) Immediately after making the complained-of remarks, the prosecutor highlighted evidence showing defendant knew the checks were stolen. For

---

[3] This evidence (or lack thereof) was relevant to the mental state element of burglary and possession of stolen property.

example, he wore a sombrero to Atoyaz Market when he cashed Sedillo's checks, and he was identified by Sedillo as the person who stole her checks. The prosecutor urged the jurors to consider the evidence rather than to speculate. Applying the *Berryman* standard, it is not reasonably likely the jurors would have understood the prosecutor's remarks to mean defendant had the burden to prove he did not know the checks were stolen.

But defendant points out the court excluded his proffered evidence of a statement he made to Esparza that he did not know the checks were stolen.[4] He concludes it was improper for the prosecutor to comment on the absence of such evidence. Not so. When a trial court properly excludes a defendant's proffered evidence, a prosecutor may comment on the absence of such evidence. (*People v. Lawley* (2002) 27 Cal.4th 102, 152, 156.)

We turn next to defendant's contention the prosecutor lessened the People's burden of proof by misstating the reasonable doubt standard. In her closing statement, the prosecutor told the jurors: "If you had a doubt, you would have to be able to articulate it, and it has to be based on the evidence." Defendant argues the prosecutor, with this language, misstated the law and suggested that affirmative evidence must exist to support a juror's reasonable doubt.

As the Attorney General concedes, the prosecutor's remark was erroneous. "[T]o the extent [a prosecutor claims] there must be some affirmative evidence demonstrating a reasonable doubt, [he or she is] mistaken as to the law, for the jury may simply not be persuaded by the prosecution's evidence." (*Hill, supra*, 17 Cal.4th at p.

---

[4]     Defendant sought to introduce this evidence through Esparza's testimony. The court found the statement was "self-serving." The statement did not come within Evidence Code section 1220's party admission exception to the hearsay rule because it was not offered against defendant. Defendant does not contend the court abused its discretion by excluding the evidence. (*People v. Lawley*, *supra*, 27 Cal.4th at p. 153 [trial court's ruling on whether statement came within hearsay exception reviewed for abuse of discretion].)

831.)  "For a defendant to be found not guilty, it is not necessary that the evidence as a whole prove his innocence, only that the evidence as a whole fails to prove his guilt beyond a reasonable doubt."  (*People v. Anderson* (2007) 152 Cal.App.4th 919, 932.)

But, immediately after her misstatement, the prosecutor told the jury:  "But I just want you to know, beyond a reasonable doubt is in a CALCRIM that you will have in your jury instructions.  It's not imaginary doubt. . . .  And again, it's CALCRIM [No.] 220.  And I encourage you to read that and . . . apply the facts to the law."

The court instructed the jury with CALCRIM No. 220 on reasonable doubt, including that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true" and that the "evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt."  The instruction also stated:  "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial.  Unless the evidence proves the defendant's guilt beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."  The court also instructed the jurors that, if they believed the attorneys' comments on the law conflicted with the court's instructions, the jurors were to follow the court's instructions.  (CALCRIM No. 200.)

In the context of the whole argument and the instructions, it is not reasonably likely the jury misconstrued the prosecutor's remark to require a reasonable doubt to be based on affirmative evidence.  Although the prosecutor should have exercised more caution with her definition, she immediately and emphatically encouraged the jury to read the court's instruction on reasonable doubt, thus superseding her erroneous comment.  Jurors are presumed to be intelligent and capable of correctly understanding the court's instructions.  (*People v. Lewis* (2001) 26 Cal.4th 334, 390; *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)  Under the *Berryman* standard, the prosecutor did not shift the burden of proof.

9

2. *The prosecutor did not comment on defendant's failure to testify.*

Defendant contends the prosecutor implicitly referred to his decision not to testify when she commented, in rebuttal, on the absence of evidence he did not know the checks were stolen. He argues the sole way he could introduce such evidence was by testifying, and therefore the prosecutor's comment invited the jury to consider his failure to testify as evidence of his guilt.

In *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*), the Supreme Court held that the Fifth Amendment forbids "comment by the prosecution on the accused's silence . . . ." (*Griffin*, at p. 615.) "Prosecutorial comment which draws attention to a defendant's exercise of his constitutional right not to testify, and which implies that the jury should draw inferences against defendant because of his failure to testify, violates defendant's constitutional rights." (*People v. Murtishaw* (1981) 29 Cal.3d 733, 757, superseded by statute on another point as recognized in *People v. Boyd* (1985) 38 Cal.3d 762, 772-773.)

Defendant argues the prosecutor committed *Griffin* error by pointing to the lack of evidence. But *Griffin's* "protection of the right to remain silent is a 'shield,' not a 'sword' that can be used to 'cut off the prosecution's "fair response" to the evidence or argument of the defendant.'" (*People v. Lewis* (2004) 117 Cal.App.4th 246, 257.) "A prosecutor may call attention to the defendant's failure to present exculpatory evidence if those comments do not call attention to the defendant's failure to testify and are not of such a character that the jury would naturally and necessarily take them to be a comment on the failure to testify." (*United States v. Lopez* (9th Cir. 1986) 803 F.2d 969, 973.) Here, the prosecutor's comments did not draw attention to defendant's silence. Rather, they "constituted proper comment on the evidence, and a proper comment in response to defense counsel's argument." (*People v. Hughes* (2002) 27 Cal.4th 287, 394.) There was no *Griffin* error.

10

3. *The prosecutor did not imply that defendant escaped punishment for earlier crimes.*

Defendant contends the prosecutor committed misconduct by characterizing him as someone who picks on the weak, and implying he was guilty and had escaped punishment for earlier crimes. In her closing statement, the prosecutor said, "He picks on the weak, ladies and gentlemen. He picked on [Sedillo] because she's a young girl out at night. He picks on his friends, Jose Esparza, because he knows he can cash checks through them."

While it is true the prosecutor characterized defendant as someone who picks on the weak, she supported her argument wholly with evidence from the record. A prosecutor may make fair comment on the evidence and draw reasonable inferences from it. (*People v. Wharton*, *supra*, 53 Cal.3d at p. 567.) Here, the prosecutor sought to highlight the differences between Sedillo, a five-foot-tall woman with a small child, and defendant, a bigger, older man with a "real gun." Accordingly, the prosecutor's comment fell within the bounds of fair argument.

Defendant also argues the prosecutor committed misconduct by exhorting the jury not to let defendant get away with it. In her closing statement, the prosecutor stated, "[D]on't let him get away with it." Accompanying her exhortation was a power point slide reading: "[D]on't let him get away with it this time." On appeal, defendant argues the prosecutor implied it was the jury's duty to convict him. He further argues the prosecutor's comment, "[D]on't let him get away with it this time," referenced Moulin's stricken testimony about defendant's assault on the soccer referee (discussed later in this opinion), and therefore referred to evidence off the record.

The prosecutor began her closing statement by describing in detail how defendant had eluded detection several times and almost got away with his crimes. We paraphrase her comments. Defendant would have likely "gotten away with" the robbery because Sedillo did not "see a license plate, if there was one, on the car." But, because

11

there was "no cash" in Sedillo's purse, defendant cashed Sedillo's paychecks under a false name at Atoyaz Market and got "out of there" with over $400. He would "have probably gotten away with it, too," except that Knight had "stopped payment on the checks . . . ." Consequently, Esparza confronted defendant at the market about the stopped checks. Defendant "[n]ever [went] back in the store again," because he knew the police would be "looking for the person who robbed" Sedillo of her checks. But defendant had the "ace in the hole going for him" that the police were "looking for Mario Luna." It was "almost the perfect crime." The police could not "find Mario Luna" and the "case was cold." Moulin "crack[ed] the case" when he recognized the suspect's photo (without a sombrero) from the video and said, "That's not Mario Luna. That's Jacobo."

Viewed in this context, the prosecutor's final comment, "don't let him get away with it this time," can be reasonably interpreted to refer to the fact the case almost went unsolved and that, at several points in the case, defendant almost got away with his acts. The prosecutor described defendant as a "smooth operator" who almost got away with the perfect crime. Her exhortation could reasonably be interpreted to mean — don't let this elusive smooth operator, who was caught through sheer happenstance, get away with his crimes at this stage of the case. In determining whether it is reasonably likely the jury understood or applied the complained-of comments in an improper or erroneous manner, "we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye*, *supra*, 18 Cal.4th at p. 970, disapproved on another point in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.) We conclude it is not reasonably likely the jury construed or applied the challenged remarks in an objectionable fashion.

12

B. *Questioning Witnesses*

Defendant contends the prosecutor, while questioning witnesses, committed misconduct by eliciting inadmissible character evidence and by expressing her personal opinion he was guilty.

1. _____ *Defendant was not prejudiced by the prosecutor's eliciting Moulin's stricken testimony about defendant's assault on a soccer referee.*

Defendant contends Moulin's testimony about defendant's assault on a soccer referee constituted inadmissible character evidence. In a pretrial motion in limine, the prosecution sought to introduce, for impeachment purposes if defendant were to testify, evidence of defendant's assault on a soccer referee. The court excluded the evidence under Evidence Code section 352.

Subsequently, during the presentation of defendant's case, the defense called Moulin as a witness. During direct examination, defense counsel elicited Moulin's testimony that he recognized the suspect's photo in the police report as being that of defendant, his "former soccer mate." In a lengthy line of questioning, defense counsel elicited Moulin's testimony that, from 2009 to 2010, he played on a soccer team with defendant for 90 minutes per game on a "real" soccer field in Palm Springs. In response to defense counsel's questioning, Moulin described defendant as someone who was quite fit back when they played soccer together, and specifically not overweight. Thus, the defense sought to establish that Moulin's description of defendant was inconsistent with Sedillo's description of her robber as "stocky."

The prosecutor then cross-examined Moulin, and asked when was the last time he had seen defendant. Moulin replied he last saw defendant when they played soccer on October 1, 2011, and that Moulin had to leave the game to take his wife to the hospital to deliver their baby. The prosecutor then asked, "And you hadn't played soccer with him again after that"? Moulin replied, "That's right." The prosecutor asked, "Why

13

not?" Moulin replied, "Because he was expelled from the Palm Springs soccer competition after assaulting the referee."

Defense counsel objected and moved to strike the last answer. The court ordered it stricken.

Defendant subsequently moved for a mistrial on this basis. In opposition, the prosecutor explained that, when she asked Moulin why he had not seen defendant in the several months before the robbery, she had expected Moulin to say he was occupied with his new baby. The prosecutor had been unaware of defendant "not being permitted to play." Although she had failed to instruct Moulin not to mention the assault, she had instructed him to avoid mentioning the conviction after the court excluded the evidence. The prosecutor argued that the defense opened the door by asking about soccer. She pointed out the court immediately struck the answer, and that Moulin said nothing about a criminal prosecution.

The court denied defendant's mistrial motion, explaining it had struck the single answer and did not "think the way it was mentioned and the way it was handled" prejudiced defendant or that it would affect the outcome of the case.

The prosecutor's eliciting of the lone statement, which was immediately stricken, did not render the trial fundamentally unfair. As to whether it was misconduct under state law, however, even giving the prosecutor the benefit of the doubt as to her assertion she expected Moulin to testify he had not played soccer since his baby was born, the prosecutor committed misconduct by failing to admonish Moulin not to mention the assault and then asking a question that elicited the excluded evidence. The prosecutor stated she instructed Moulin not to mention defendant's *conviction*, but the court's ruling on the motion in limine excluded evidence of the *assault*.

Nonetheless, it is not reasonably likely defendant would have received a more favorable result absent Moulin's mention of the assault. The court immediately sustained defense counsel's objection and struck the testimony. The court later instructed

14

the jury to disregard and not to consider for any purpose any stricken testimony. (CALCRIM No. 222.) Jurors are presumed to be capable of correctly understanding and following the court's instructions. (*People v. Lewis*, *supra*, 26 Cal.4th at p. 390; *People v. Sanchez*, *supra*, 26 Cal.4th at p. 852.)

        2. _____ *Defendant has waived his contention the prosecutor expressed a personal belief he was guilty.*

Defendant argues the prosecutor expressed a personal belief he was guilty by suggesting during redirect examination that Sedillo would not want to get up and stare her robber in the face. He has waived this argument, however, by failing to support it with any legal authority. (Cal. Rules of Court, rule 8.204(a)(1)(B); *People v. Stanley* (1995) 10 Cal.4th 764, 793.)

Defendant also argues the prosecutor expressed a personal belief he was guilty by referring to him as a "robber" during direct examination of Sedillo. He provides no record references, however, as required by California Rules of Court, rule 8.204(a)(1)(C). We therefore deem the contention to be waived. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.)

II

JURY MISCONDUCT

A. *Defendant's New Trial Motion and the People's Opposition*

Defendant moved the court for a new trial on grounds, inter alia, of jury misconduct. Defendant's new trial motion asserted that, several days after the verdict, defense counsel ran into Juror No. 4 at an Office Max store. In their "brief meeting," Juror No. 4 told defense counsel the jurors discussed defendant's failure to testify during their deliberations. Defense counsel drafted a declaration for Juror No. 4 — which Juror No. 4 reviewed, edited, and signed — and then attached the declaration as an exhibit to

15

defendant's new trial motion. Juror No. 4's declaration stated, inter alia, that the jurors discussed why defendant did not testify and said they wanted to hear defendant testify to see if he had an accent, and that Juror No. 4 told the other jurors that "the defense did not allow [defendant] to testify so that [the] jurors would not learn more about his earlier crimes," as had been "hinted" at in Moulin's testimony, and so as not to contradict the defense's claim defendant spoke with an accent.

The People opposed defendant's new trial motion. They asserted that parts of Juror No. 4's original declaration invaded the jurors' thought processes and/or were hearsay, and were therefore inadmissible. The People conceded that the jurors committed misconduct when they mentioned defendant's failure to testify, but argued the jurors' conduct did not prejudice defendant.[5]

The People attached a new declaration from Juror No. 4 to their opposition. The opposition described the process by which the People obtained the new declaration from Juror No. 4. When contacted by the People's investigator, Juror No. 4 "indicated he absolutely wanted [to] talk to the prosecution to 'clean up this mess.'" Juror No. 4 said the statements in his original declaration "were not completely accurate." The prosecutor drafted a new declaration based on her discussion with Juror No. 4. Juror No. 4 and the prosecutor went over the declaration many times together "until it accurately and completely stated [Juror No. 4's] feelings and beliefs."

Juror No. 4's new declaration included the following statements. "During deliberations, the subject of the defendant not testifying came up in the context of whether or not he had an accent." "The discussion regarding this was transitory and

---

[5] On appeal, the Attorney General partially retracts this concession by arguing that, as to whether defendant spoke with an accent, the jurors did not discuss his failure to testify from a testimonial standpoint, but rather as a comment about his refusal to provide the equivalent of a voice exemplar. Nonetheless, the Attorney General concedes the alleged discussion about defendant hiding his criminal record "went to actual testimonial matters."

16

lasted less than a minute." "It was raised momentarily and no one commented again." "The only reference to him testifying or not was that it would show whether he had an accent or not, it was not to the issue of his guilt or innocence." Juror No. 4 did *not* say defendant "did not testify because the defense did not want to contradict its claim that he spoke with an accent"; Juror No. 4's first declaration (prepared by defense counsel) was inaccurate in this respect. Juror No. 4 did *not* "discuss with the jurors anything Officer Moulin said about a possible criminal record" of defendant; Juror No. 4's first declaration (prepared by defense counsel) was inaccurate in this respect. Juror No. 4's discussion with defense counsel "was to try to discuss with him what [the] weaknesses were of his presentation, because he asked me." Defense counsel first wrote a declaration for Juror No. 4 which "was inaccurate in many respects." Juror No. 4 "asked him to re-write it" and then "skimmed" the revised declaration before signing it. Juror No. 4 "said, Well, I guess this is close enough for government work." Juror No. 4 "did not read it in detail. [He] did not know until [he] was leaving [defense counsel's] home what it would be used for." Juror No. 4 had read the new declaration (prepared by the prosecutor) "carefully and it is accurate to what [he] feel[s] and think[s]."[6]

In their opposition, the People argued that no further juror conduct (such as through an evidentiary hearing) was warranted as Juror No. 4 had clearly provided all the information he could on the matter, no evidentiary dispute existed, and no evidence demonstrated a strong possibility of prejudicial juror misconduct.

---

[6] Defendant contends paragraphs 8 to 12 and 20 to 22 of Juror No. 4's second declaration are inadmissible because they refer to the jurors' subjective thoughts. (Evid. Code, § 1150, subd. (a).) Our independent determination that defendant was not prejudiced by the jury misconduct is *not* based, in whole or in part, on those paragraphs. Nor does this opinion's description of Juror No. 4's second declaration include any of those paragraphs.

B. *The Jury's Discussion of Defendant's Failure to Testify was not Prejudicial*

Defendant contends the court prejudicially erred by denying his motion for a new trial based on jury misconduct.

"A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors." (*People v. Nesler* (1997) 16 Cal.4th 561, 578.) "An impartial juror is someone 'capable and willing to decide the case solely on the evidence' presented at trial." (*Id.* at p. 581.) Thus, a juror commits misconduct by prejudging a case. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1412.) A "verdict will only be set aside if there appears to be a substantial likelihood of juror bias." (*People v. Loker* (2008) 44 Cal.4th 691, 747.)

It is generally misconduct for a jury to discuss a defendant's failure to testify. (*People v. Loker*, *supra*, 44 Cal.4th at p. 749.) Such misconduct creates a presumption of prejudice which may be rebutted by a finding that there is no substantial likelihood the complaining party suffered actual harm. (*Ibid.*) "Whether prejudice arose from juror misconduct is a mixed question of law and fact. We review legal issues independently, and accept the trial court's factual findings if they are supported by substantial evidence." (*Id.* at p. 747.)

Here, the court found the jury mentioned defendant's failure to testify merely "in passing." That factual finding is supported by substantial evidence contained in Juror No. 4's second declaration.

Although the jury did commit misconduct by discussing defendant's failure to testify, our independent review satisfies us that defendant was not prejudiced by such misconduct. This "was not a discussion of any length or significance." (*People v. Hord* (1993) 15 Cal.App.4th 711, 728.) Juror No. 4 described the discussion of defendant's failure to testify as "transitory," lasting "less than a minute," and further stated it "was raised momentarily and no one commented again." In his second declaration, he denied discussing anything Moulin said about defendant's possible criminal record, and declared

18

his first declaration was inaccurate in this respect. Thus, the focus of the jury's discussion was on whether defendant spoke English with an accent. It is not substantially likely defendant suffered any actual harm from the jurors' brief discussion of their inability to hear whether he had an accent since he did not testify. "Transitory comments of wonderment and curiosity, although misconduct, are normally innocuous, particularly when a comment stands alone without any further discussion." (*Hord*, at pp. 727-728.)

C. *The Court did not Abuse its Discretion by Denying Defendant's Request for an Evidentiary Hearing to Question Jurors*

Defendant contends the court improperly denied his request for an evidentiary hearing to question Juror No. 4 and the other jurors. The court denied any additional discovery as to any other jurors, finding there was "no basis to go any further" and that the "transitory discussion" was in "passing" and "in no way affected the judgment of the jury."

In *People v. Hedgecock* (1990) 51 Cal.3d 395, 415, our Supreme Court held that "when a criminal defendant moves for a new trial based on allegations of jury misconduct, the trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations." But our Supreme Court cautioned that "the defendant is not entitled to such a hearing as a matter of right. Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (*Ibid*.) *Hedgecock* emphasized that, "when considering evidence regarding the jurors' deliberations, a trial court must take great care not to overstep the boundaries set forth in Evidence Code section 1150," which bars consideration of jurors' mental processes in the course of their deliberations. (*Id*. at pp. 418-419.)

19

On appeal, a trial court's decision not to hold an evidentiary hearing when a defendant alleges jury misconduct is reviewed for an abuse of discretion. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1252, 1256.)

We find no abuse of discretion in the court's decision not to hold an evidentiary hearing. Juror No. 4's second declaration characterized the discussion about defendant's failure to testify as "transitory," and denied that he discussed defendant's possible criminal record. The court obviously credited Juror No. 4's second declaration and found the transitory discussion about defendant's failure to testify did not affect the jury's judgment. The court found "no basis to go any further" — in other words, no material factual conflict in the evidence. The court did not abuse its discretion by denying defendant's request for an evidentiary hearing.

III

CUMULATIVE ERROR

In his final contention, defendant asserts the cumulative effect of the errors requires reversal of his convictions. (*Cooper v. Fitzharris* (9th Cir. 1978) 586 F.2d 1325, 1333 (en banc) ["prejudice may result from the cumulative impact of multiple deficiencies"].) But there were only three errors. One was the jury's misconduct in discussing his failure to testify, and we have independently determined he was not prejudiced by the jury's brief discussion. Another error was the prosecutor's misstating the reasonable doubt standard, which we have independently determined did not prejudice defendant. The third error was the prosecutor's failure to instruct Moulin not to mention defendant's assault on the referee and then eliciting Moulin's testimony on the subject, which we independently determined was not prejudicial. Even aggregating the effects of Moulin's testimony, the prosecutor's misstatement, and the jury's discussion, defendant was not prejudiced under any standard. The evidence against him was overwhelming, whereas the jury's discussion was transitory, Moulin's testimony was

20

stricken, and the prosecutor negated her misstatement by urging the jurors to focus on the court's instruction on reasonable doubt.

## DISPOSITION

The judgment is affirmed.


IKOLA, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


THOMPSON, J.

21